MICHAEL D. BRESLAUER [SBN 110259]
mbreslauer@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
Telephone (619) 231-0303
Facsimile (619) 231-4755

ROBERT R. BARNES [SBN 144881]
robertbarn@outlook.com
THE BROKEN-BENCH LAW FIRM
10982 Poblado Road, No. 1621
San Diego, California 92127-5327
Telephone: (619) 218-0520

*Co-Counsel for Debtor-In-Possession*
*And Plan Proponent*
CUKER INTERACTIVE, LLC

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>CUKER INTERACTIVE, LLC,<br><br>Debtor-In-Possession. | Case No. 18-07363-LA11<br><br>**DEBTOR'S REPLY IN SUPPORT OF MOTION TO CONFIRM FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 15, 2020**<br><br>Date: November 18, 2020<br>Time: 10:00 a.m.<br>Dept: Two (2)<br><br>Honorable Louise DeCarl Adler |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. PILLSBURY'S NON-IMPAIRMENT CONFIRMATION OBJECTIONS SHOULD BE OVERRULED .......... 3

A. Good Faith .......... 3

B. Adequate Means for Implementation .......... 6

C. Feasibility .......... 7

D. Insider Compensation .......... 9

III. WOLFE'S CONFIRMATION OBJECTIONS SHOULD BE OVERRULED .......... 16

IV. THE PLAN LEAVES CREDITORS' RIGHTS UNALTERED AND CREDITORS UNIMPAIRED .......... 10

A. The Federal Judgment Rate Is The Unimpairing Post-Petition/Pre Effective Date Interest Rate .......... 10

B. The Plan Does Not Affect When Or How Pillsbury's Claim Is "Allowed" .......... 12

C. The Plan Does Not Affect The Rights Of A Creditor To Pursue A Fraudulent-Transfer Action, Although The Code Does .......... 14

D. The Plan Does Not Discharge Debts And Should Not Unduly Immunize Statements .......... 15

E. The Prevention Of An Estoppel Is Not Impairment .......... 15

V. CONCLUSION .......... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ad Hoc Committee of Holders of Trade Claims v. PG&E Corp.*,
614 B.R. 344 (N.D. Cal. 2020, a related decision from the district court.) .......... 12

*Delgado Oil Co. v. Torres*,
785 F.2d 857 (10th Cir. 1986) .......... 14

*In re Madison Hotel Assocs*.
749 F.2d 410 (7th Cir. 1984) .......... 3

*In re Marsch*,
36 F.3d 825 (9th Cir. 1994) .......... 4

*In re New Valley Corp.*,
168 B.R. 73 (Bankr. D.N.J. 1994) .......... 12

*Onink v. Cardelucci (In re Cardelucci)*,
285 F.3d 1231 (9th Cir. 2002) .......... 11, 12, 13

*In re PG&E Corp.*,
610 B.R. 308 (Bankr. N.D. Cal. 2019) .......... 12

*In re Pikes Peak Water Co.*,
779 F2d 1456 (10th Cir. 1985) .......... 8

*Sherwood Partners, Inc. v. Lycos, Inc.*,
394 F.3d 1198 (9th Cir. 2005) .......... 14

*In re Sylmar Plaza, LP*,
314 F.3d 1070 (9th Cir. 2002), *cert denied,* 538 U.S. 1035 (2003) .......... 3

**Federal Statutes**

11 U.S.C.
§ 726(a)(5) .......... 11, 12

28 U.S.C.
§ 1961(a) .......... 11

Bankruptcy Code
§ 1129(a)(3) .......... 3
§ 1129(a)(5)(B) .......... 9, 10
§ 1129(a)(11) .......... 8

§ 105 .......... 7
§ 1124 .......... 12, 14
§ 1129 .......... 14
§ 1141 .......... 15

**California Statutes**

Cal. Civ. Code
§ 3439 .......... 14

Debtor-In-Possession and Plan Proponent, Cuker Interactive, LLC, ("Cuker" or the "Debtor"), respectfully submits this Combined Reply in support of its Motion to Confirm Fourth Amended Chapter 11 Plan of Reorganization dated September 15, 2020 (the "Plan"). Objections were filed by two creditors holding disputed claims, Pillsbury Winthrop Shaw Pittman, LLP ("Pillsbury") and the Wolfe Legal Group, P.C. ("Wolfe"). This single reply addresses both objections and therefore exceeds the page limit but is accompanied by an ex parte request to allow more space for reply.

## I. INTRODUCTION

Cuker's Chapter 11 story is remarkable. When it sought bankruptcy protection after its near-death experience of litigating with one of the world's biggest corporations in its home court, it had virtually no cash and needed DIP financing to continue its appeal. It was, and still is, a case filed in good faith by an honest Debtor seeking respite from significant litigation while it gathered resources to defend and prosecute an Eighth Circuit appeal. Following its breathing spell from the litigation, affirmance by the Eighth Circuit, resolution and compromise with some creditors and despite the disruption of a pandemic, Cuker's profitability now provides the Court with a rarity: a 100% payment plan which provides for post-petition interest at a rate in dispute but to be decided by the Court, and without impairing any class of claims or creditor. Cash-on-the-barrelhead. Pillsbury's claim, including the interest rate Pillsbury demands, stands at $1,789,471 as of the projected date of payment (June 2021). At this time, $1,968,699 is on deposit in a blocked account, which the Debtor cannot access without this Court's order. And yet Pillsbury objects, cries foul and alleges bad faith?

The reality, of course, is that Pillsbury has no measurable economic risk from the plan: today, cash locked up in the segregated account is more than sufficient to pay Pillsbury. Pillsbury is not worried that Cuker **won't do** what it promises in the plan: Pillsbury is apparently terrified that Cuker **will do exactly** what it promises.

Despite Pillsbury's attacks throughout the Chapter 11 case, Cuker has survived and is now asserting its defense to Pillsbury's claim and its own counterclaim. Objecting to exclusivity, Pillsbury desperately sought to replace the Cuker management team with someone who would not pursue Pillsbury as vigorously. Pillsbury's actions have succeeded only in imposing tens of thousands of dollars in unnecessary costs on Cuker, costs that are now borne by equity, , because equity is committed to paying all allowed claims in full.

Pillsbury's opposition is premised on the conclusion that Cuker *deserves* to be on a short leash, tethered to a plethora of draconian plan terms to ensure that it continues to litigate its disputes with Pillsbury in the fashion Pillsbury chooses. Pillsbury complains without legal support that Cuker's existing disclosure of insiders and their compensation, but without post confirmation limitations, should block confirmation. Pillsbury complains that the Debtor must be forced to concede Pillsbury's estimates of the cost of the AAA arbitration, or that the Debtor should be ordered by this Court to complete the Arbitration, dates for which have been set and which will conclude in early March 2021. Pillsbury is not merely collecting a debt claimed owed to the firm, they are enraged that Cuker would raise claims against it, and that animus has guided its conduct throughout this case. Aside from the interest rate/impairment dispute (which raises purely legal issues for the Court to decide), however, the balance of the Pillsbury objections fall by the board as unwarranted and unsupported by the Bankruptcy Code or other authority.

Wolfe objects, but raises only one real confirmation issue, which is the unimpairment interest rate to which she is entitled if she holds an unsecured claim: the 2.69% proposed by Cuker or the 21.6 (or 31.6%) per year she asserts. Whether Cuker owes her anything, how much, whether the claim is secured or unsecured, will be determined in the pending claim objection (or in a fee application should she pursue one) and will not be affected by the Plan.

## II. PILLSBURY'S NON-IMPAIRMENT CONFIRMATION OBJECTIONS SHOULD BE OVERRULED

Pillsbury's objections unelated to "impairment", while to some extent overlapping, fall into four categories: (i) Cuker's lack of good faith; (ii) inadequate means for implementation; (iii) lack of compliance regarding post-confirmation, insider compensation; and (iv) lack of adequate showing of feasibility. None present appropriate grounds to deny confirmation.

### A. Good Faith

Pillsbury objects that the 100% payment plan with interest runs afoul of Bankruptcy Code Section 1129(a)(3) because Cuker's Plan evidences a lack of good faith; that it seeks a result inconsistent with the objectives of the Bankruptcy Code; that the Patricia Atalla and Aaron Cuker forbearance and tolling agreements are a 'fraud on creditors' and that the case should be dismissed. These objections are specious.

The standard of Section 1129(a)(3) is whether "the plan will fairly achieve a result consistent with the Bankruptcy Code. … viewed in light of the totality of circumstances surrounding the confection of the plan…[and] the bankruptcy judge is in the best position to assess the good faith of the parties' proposals." *In re Madison Hotel Assocs*. 749 F.2d 410, 424-425 (7th Cir. 1984), cited with approval in *In re Sylmar Plaza, LP*, 314 F.3d 1070, 1074 (9th Cir. 2002), *cert denied,* 538 U.S. 1035 (2003). This good faith determination is based on the totality of the circumstances. *In re Stolrow's Inc*., 84 Bankr. 167, 172 (Bankr. 9th Cir. 1988).

The 9th Circuit's decision in *In re Sylmar Plaza, LP* is instructive here because a creditor objected to confirmation on the grounds that a solvent debtor was using a provision of the bankruptcy code affirmatively to 'unimpair' the creditor and pay the creditor a lower (nondefault) interest rate than might otherwise be required under non-bankruptcy law. The court rejected these arguments, finding that the plan filed to take advantage of the provisions of the Bankruptcy Code was not filed in

bad faith. In ruling, the Ninth Circuit acknowledged that a debtor could take advantage of Bankruptcy Code provisions modifying a creditor's contractual rights and that a debtor's plan had satisfied the requirement that it be proposed in good faith. *In re Sylmar Plaza, LP*, *supra*, 314 F.3d at 1075, citing with approval *In re PPI Enter. Inc.*, 228 Bankr. 339, 344-45 (Bankr. D. Del. 1998), aff'd 324 F.3d 197 (3rd Cir. 2003) (not bad faith to take advantage of Code provisions for purpose of capping the amount of a creditor's claim).

Pillsbury never asserted that Cuker's Chapter 11 case itself was filed in bad faith. It was not a case about a 'broken business' but rather, from the inception, a case about the need for a 'breathing spell.' The respite was necessary for Cuker to refocus on its business, to save the jobs of its employees, and to attempt to resolve claims. Its position has been from the outset that resolution was needed on the Eighth Circuit appeal to enable a proper and fact-based foundation for its reorganization. The Debtor quickly arranged for continued retention of its appellate counsel (Dkt. No 67; February 15, 2019). The appellate result affirming the underlying judgment came in February 2020, followed quickly by the pandemic.

But through this almost two years under Bankruptcy protection and supervision, Cuker has shown that it is a profitable business. Profitable enough that, along with the Wal-Mart judgment affirmed on appeal, Cuker was able to propose a plan that paid all allowed claims in full with interest as decided by the Court, and providing the cash up front to support that promise. For this, Pillsbury cries foul and a lack of good faith.[1] Not because Pillsbury is harmed in any way (although they profess a fear (Opposition, p. 5; lines 20-21) that they will somehow be 'forced to settle' their claims), but because they assert, without evidence, that Cuker is abusing

---

[1] Pillsbury's reliance on *In re Marsch*, 36 F.3d 825 (9th Cir. 1994) is particularly ironic (and inapt), given that Cuker's case involves a debtor which has become able to generate sufficient profits to pay all claims in full only after time, while *Marsch* involved a solvent debtor able to pay all claims in full on the petition date. *Marsch* does not assist Pillsbury's good faith argument.

the process to assert objections to claims. While Cuker has settled several claims and raised three objections (other than to Pillsbury's claim being resolved in the Arbitration), these facts don't rise to Cuker's bad faith to proffer a plan that is inconsistent with the objectives of the Bankruptcy Code. Under the totality of circumstances of this case, Cuker's 100% payment plan, with post-petition and post confirmation interest is proposed in good faith and not to contravene the purposes of the Bankruptcy Code.

Finally, Pillsbury objects on good faith grounds because the Forbearance Agreements signed by Patricia Atalla and Aaron Cuker are a 'fraud on creditors' and are 'poorly drafted.' Neither facet of this good faith objection has merit. The Forbearance Agreements were first proposed as a means to further define the Debtor's relationship with insiders who also hold secured claims against the Debtor, providing creditors with assurance that neither creditor would seek or receive any money on account of their claims until all creditors were paid. Pillsbury objected that creditors could not enforce the agreements. The Debtor responded by inserting provisions making creditors express third party beneficiaries of the Forbearance Agreements with rights to enforce the agreements against either Cuker or the insiders. When Pillsbury raised the issue of the Cuker's current refusal to undertake avoidable transfer litigation against the Insiders (in the context of a 100% payment plan), Cuker responded by arranging with the Insiders to agree that the limitations period applicable to such avoidance actions tolled for a year, considerably longer than the time within which all disputed matters will be resolved. It is the Debtor's interpretation of the Forbearance Agreements that Patricia and Aaron may neither seek nor receive any money from Cuker on account of their claims against Cuker until all claims are paid, while ordinary course salary and benefit payments may be paid.

Cuker entered Chapter 11 with a professed intention to ultimately pay all allowed claims in full. Cuker's ability now to do so with cash on the barrelhead does

not transform such an ability -- as expressed through its Plan -- into one which is incompatible with the purposes of the Bankruptcy Code. Pillsbury's 'good faith' objection should be overruled.

**B. <u>Adequate Means for Implementation</u>**

Pillsbury's objections here are bifurcated into fears about transfers to insiders and Arbitration concerns. As of October 31, 2020, the Debtor holds $1,968,699.72 in the Wal-Mart Segregated Account which can be accessed only with this Court's order and $1,015,824 in its Plan segregated account which is designated for performance of its obligations under the Plan. Additionally, the Debtor will receive the proceeds of a $200,000 loan from Aaron Cuker to fully provide for all potential creditor claims. Nothing in the record created in this case -- from the moment of the filing on December 13, 2018 to today -- suggests that extraordinary measures should be incorporated into the Plan or the order confirming the Plan which prevent asset transfers or non-Plan activities whether within or outside the ordinary course of business. Pillsbury presents no evidence of the need for such measures, and Pillsbury's unfounded cynicism does not support added requests to modify Cuker's Plan or in the Order confirming it. Following confirmation, Cuker will obligated to perform the Plan and no grounds or authority exist to add provisions addressing unfounded concerns. And with respect to Pillsbury's claim, while unsecured unless reversed on appeal, $1,968,699 stands in a blocked account and their disputed claim is pegged at $1,789,471, an amount they do not dispute.

There already exist Forbearance and Tolling Agreements with Patricia Atalla and Aaron Cuker which on their face prevent their seeking or accepting any money (other than salary/benefits in the ordinary course) until all claims are resolved and either disallowed or paid.

With respect to the Arbitration, Pillsbury wants unwarranted and duplicative measures to ensure that the Arbitration proceeds as Pillsbury believes it ought to proceed. Pillsbury's requests improperly involve this Court in the affairs of the

Arbitration itself. There is now an established comprehensive Arbitration Case Management Order setting dates for the exchange of documents, designation of experts, depositions, and the actual Arbitration hearing itself. A copy is attached hereto as Exhibit A. It will commence in February 2021 and conclude in the first week of March 2021. If there is a complaint about Cuker's adherence to the schedule, Pillsbury is free to bring the matter before the AAA panel for enforcement. Bringing such complaints to this Court, regardless of the merits (or not), inappropriately inserts this Court into the workings of the AAA panel. And Pillsbury continues to omit from its presentations to this Court that it already has the right to immediately come to this Court if the alleged infraction is the non-payment of AAA fees. In the Court's Order granting Pillsbury's motion for relief from stay (Dkt. No. 258), Pillsbury's request that the Debtor be ordered to pay AAA fees was denied but allows Pillsbury to bring the issue of nonpayment to this Court on five days' notice.

Finally, the objections that posit that Cuker's contingency counsel could quit are just too far down the 'what if' rabbit hole. In an undisguised effort to drive Cuker's contingency counsel out of the arbitration, Pillsbury asks this Court to impose unheard-of obligations on him, to commit, beyond the confines of the California Rules of Professional Conduct, to prosecute the arbitration. Not even Section 105 of the Code stretches that far. And of course, Pillsbury has previously taken a flexible view of the application of those Rules of Conduct, ignoring the California obligations to a California client when they interfere with Pillsbury's alleged lien. Cuker has an interest in seeing its $200 Million malpractice claim resolved as quickly as possible and as ordered by the AAA panel. These objections should be overruled

**C. <u>Feasibility</u>**

Pillsbury objects that the Plan is inherently infeasible because: (i) Aaron Cuker might make a loan to Cuker only if it's needed and not if it is unneeded on the

Effective Date; (ii) Cuker's estimates of Arbitration costs are different from Pillsbury's; and (iii) Insider compensation might go up post-confirmation. None of these objections should be sustained.

The question of feasibility asks simply: Is confirmation likely to be followed by the debtor's liquidation or the need for further financial reorganization? Bankruptcy Code Section 1129(a)(11). The feasibility standard does not impose a guaranty of success. While Cuker believes, of course, given its strong track record thus far in the case, that its business prospects quite good, all that is required is "a reasonable assurance of commercial viability." *In re Prudential Energy Co*. 58 Bankr. 857, 862 (Bankr. S.D.N.Y. 1986). The Court should scrutinize the plan to determine "whether it offers a reasonable prospect of success and is workable." *In re Pikes Peak Water Co*., 779 F2d 1456, 1460 (10th Cir. 1985).

Cuker easily achieves this threshold.

The loan from Aaron Cuker is to be made to show to show available cash on the Effective Date necessary to fund its full payment plan. That includes Mr. Cuker's loan of $200,000, which is included in the projections, which project a cash cushion of over $370,000 as of the date the Debtor estimates the most claims litigation would be concluded. For Pillsbury and despite their own forecasting, this date is not March 2, 2021 when the arbitration is scheduled to wrap up hearings. Rather the AAA panel will have 30 days thereafter within which to make a determination. The AAA panel's decision should thus be expected in early April. Pillsbury does not object to Cuker's calculation of the Pillsbury claim if Pillsbury prevails in the arbitration, $1,789,782. This sum is over $178,917 *less* than the cash balance today in the Wal-Mart Segregated Judgment account. Even if that sum is payable in April 2021 (or tomorrow, less accrued interest) cash exists *now* to pay it. The Plan is feasible.

Pillsbury next complains that the evidence of the Debtor's cost estimate is not presented. They are mistaken. Both the estimates and timing of outlay of expenses

are included in Cuker's projections, a basis of Ms. Chiang's expert opinion. There is no requirement that each component of the Debtor's projections of income and expense be supported by an exhaustive evidentiary record.

Finally, Pillsbury objects that the projections might not show feasibility because the Debtor might raise insider compensation. The assumptions made forecast a conservative and stable level of both income and expenses and Pillsbury's objection is without foundation[2]. While the Debtor is not required by any applicable confirmation standard to be ordered not to change post-confirmation compensation (addressed in the following section), Pillsbury's objection that ***if*** they do, and ***if*** the amount is material, then it ***might*** affect feasibility should be overruled. Their efforts to cast doubt on feasibility based on pure conjecture at odds with the projections should be overruled.

**D. <u>Insider Compensation</u>**

Pillsbury objects in three separate instances that there must be controls on the Debtor's decisions post-confirmation relating to insider compensation. This objection is the final act to their persistent but failed effort from the outset of the case to limit or deny insider compensation, an effort that took far too much of the Court's and counsel's time. First, the confirmation requirement is that the identity of insiders and the nature of their compensation must be disclosed in the Plan. Bankruptcy Code Section 1129(a)(5)(B). Cuker has done this. Cuker's Plan both identifies the insiders (Aaron Cuker, Lydia Cuker, Adel Atalla, Patricia Atalla and Osama Atalla) and states that the terms of their continued post-confirmation employment will "initially be equal to the amounts authorized by the Court during

---

[2] It is worth noting that Cuker is outperforming the conservative estimates of its post confirmation monthly gross revenue and monthly net operational profits as set forth in Ms. Chiang's projections (Dkt. No 402-3; pg. 22), $322,500 and $72,500, respectively. For the two months of September and October 2020 alone, gross revenue exceeded the estimates by a total of $123,879 and net operational profit exceeded the estimates by a total of $117,456. September and October 2020 Monthly Operating Reports, Dkt. Nos. 411 and 434.

the pendency of the Bankruptcy Case, but following the effective Date will no longer be subject to approval by the Bankruptcy Court.”. Plan section V(B).

Without authority, Pillsbury’s opposition posits a different rule from what the Bankruptcy Code requires: Pillsbury objects because the level of compensation is not fixed post confirmation, preventing Cuker without a post-confirmation order from changing compensation (higher or lower) or provide bonuses, in either case, even in a way which does not materially impact Cuker’s ability to perform its plan obligations. That’s not what the Code requires.

Section 1129(a)(5)(B) requires only the disclosure of compensation, not that court approve the level of remuneration. *In re Granite Broad. Corp*. 369 B.R. 120, 136, n. 18 (Bankr. S.D.N.Y 2007). *In re Drexel Burnham Lambert Group,* 138 B.R. 723, 760 (Bankr. S.D.N.Y 1992) (Section 1129(a)(5)(B) is satisfied where the plan discloses that certain insiders will be employed and the term of employment). Pillsbury’s insider compensation objections, thrice raised in all their forms, should be overruled.

## III. THE PLAN LEAVES CREDITORS’ RIGHTS UNALTERED AND CREDITORS UNIMPAIRED

### A. The Federal Judgment Rate Is The Unimpairing Post-Petition/Pre Effective Date Interest Rate

Under the plan, creditors holding allowed claims will receive post-petition interest at the rate that the Court determines is necessary to leave them unimpaired. Cuker submits, based on Ninth Circuit guidance and the only case to decide the issue, that that rate is the federal judgment rate, rather than a higher rate that might apply outside of bankruptcy. Pillsbury wants 10%; Wolfe apparently wants 21% or 31% per cent, based on her engagement letter and the California judgment rate.

If the debtor is solvent, as Cuker now is, why should an unsecured creditor receive less than it would outside of bankruptcy, especially if it has a contract? The answer is that Congress and the Ninth Circuit have so decided. The question of

interest in a solvent case is inevitably one of balancing equities. It is undisputed that Congress and the courts have struck that balance as follows.

1. An unsecured creditor with a judgment in a civil case in district court gets the federal judgment rate, 28 U.S.C. § 1961(a), irrespective of its contract, state law, or other entitlement.

2. In a solvent Chapter 7 case, an unsecured creditor gets "the legal rate." 11 U.S.C. § 726(a)(5), irrespective of its contract or other nonbankruptcy entitlement. According to the Ninth Circuit, that is the federal judgment rate. [*Onink v. Cardelucci (In re Cardelucci)*, 285 F.3d 1231 (9th Cir. 2002). (*Cardelucci* involved a Chapter 11 case, not Chapter 7, but the decision is predicated on the court's ruling that the legal rate under Section 726(a)(5) is the federal judgment rate.)

3. In a solvent Chapter 11 case, and without a consideration of the unimpairment question, an unsecured creditor gets the legal rate, irrespective of its contract or other nonbankruptcy entitlement. *Cardelucci*. Pillsbury's assertion that *Cardelucci* is "expressly limited to Section 726(a)(5)," Objection at 11, is not correct. The specific question in *Cardelucci* was whether the creditors were entitled under the Chapter 11 plan to interest at the state-law rate or limited to the lower federal interest rate. *Cardelucci*, 285 F.3d at 1233. It is true that the court began with an analysis of "the legal rate" under Section 726(a)(5), but the relevance of *Cardelucci*, to *PG&E* below and here, is that the court imported 726(a)(5) to determine the relevant *Chapter 11* rate.

4. In a solvent Chapter 11 case, an unsecured creditor receiving the legal rate *is unimpaired*, irrespective of its contract or other nonbankruptcy entitlement. *In re PG&E Corp*., 610 B.R. 308 (Bankr. N.D. Cal. 2019)

Pillsbury argues that the *PG&E* decision, the only reported decision directly on point, is wrong. (So is *Ad Hoc Committee of Holders of Trade Claims v. PG&E Corp*., 614 B.R. 344 (N.D. Cal. 2020, a related decision from the district court

expressing the same view but arising in a different procedural context.) Pillsbury offers analogies and dicta, but no case law. In Pillsbury's view, although the equitable balance struck by the courts and Congress between debt and equity is usually in favor of the federal judgment rate rather than nonbankruptcy entitlement, the unimpairment question under section 1124 of the Code should afford a different result. The courts stress uniformity in Chapter 7, and uniformity under *Cardelucci* and Section 1129(a)(7), but, according to Pillsbury, a different rule for Section 1124, The cases, statutes, and equity simply do not suggest such disparate and preferential treatment for Pillsbury.

Pillsbury draws the wrong conclusion from Congress's fix of the Western Union outcome. In *In re New Valley Corp.*,168 B.R. 73 (Bankr. D.N.J. 1994), the bankruptcy court ruled that a plan that paid unsecured creditors "in full" but with no postpetition interest left the creditors "unimpaired." In less than a year, Congress changed the law, deleting the portion of Section 1124 that allowed the *New Valley* result. In a solvent case, creditors must get postpetition interest. But in the 18 years since the Ninth Circuit (without addressing impairment) limited unsecured creditors in a Chapter 11 case to the federal interest rate, and notwithstanding the significant amendments to the Code in 2005, Congress has not seen fit to "fix" *Cardelucci*. In a district-court judgment, in a Chapter 7 case, in a Chapter 11 case under section 1129(a)(7) (the comparison to Chapter 7 for impaired creditors), and in a Chapter 11 case for unimpairment under Section 1124(1) and *PG&E*, unsecured creditors all get the same, uniform federal judgment rate.

### B. <u>The Plan Does Not Affect When Or How Pillsbury's Claim Is "Allowed"</u>

Irrespective of the plan, Pillsbury does not have an allowed claim. Pillsbury filed a proof of claim and obtained relief from the automatic stay to allow the arbitration to proceed, and Cuker filed a placeholder objection, pending the results of the arbitration. Pillsbury's disputed, unliquidated claim will be liquidated in the

AAA arbitration proceeding, along with Cuker's also disputed counterclaims. (For purposes of this discussion *only*, Cuker assumes that Pillsbury prevails completely: Pillsbury is entitled to its full claim.)

Liquidation in the arbitration of these dollar amounts is *not* "allowance" under the Bankruptcy Code. Something needs to happen to convert Pillsbury's mythical arbitration award into an allowed claim. Moreover, both parties have rights as litigants in the arbitration that exist under applicable non-bankruptcy law with respect to the arbitration award itself. Albeit limited, both sides retain rights post award which might affect the award. The point here is only to underscore that the plan does not alter, augment, or reduce the parties' respective rights to address the arbitration award once it is made.

There is a status conference on the Cuker objection on December 3, 2020. The parties have sniped about how many status conferences are appropriate between December and the anticipated arbitration ruling in April 2021. At the December 3 status conference, and thereafter, the parties may argue or agree about post-arbitration-ruling procedures.

But the only legal issue for the plan and confirmation hearing is that *the plan does not affect, determine, or influence, in any way, what those procedures should be*. The plan, not impairing any creditor, simply provides that if and when Pillsbury's claim is allowed, Cuker will pay it. The plan does not determine how the claim will be allowed. The plan just preserves the status quo, which importantly includes the facts that there are already adequate funds in a segregated account *and* that an additional court order (not the confirmation order) is needed before the funds may be moved. What could be simpler? How could Pillsbury object?

Well, Pillsbury thinks that the plan should afford Pillsbury additional protections merely because Pillsbury is suspicious about Cuker's true motives. The products of Pillsbury's fevered imagination do not justify special protections in the plan beyond what the Code and Rules, or applicable non-bankruptcy law outside the

plan, require. Pillsbury obtains an allowed claim, and under the plan, the claim gets paid. Sections 1124 and 1129 of the Code do not require more, and the Court should decline Pillsbury's invitation to add unnecessary burdens limit either sides' rights to address the arbitration award once it is made.

### C. The Plan Does Not Affect The Rights Of A Creditor To Pursue A Fraudulent-Transfer Action, Although The Code Does

Currently, pre-confirmation, neither Pillsbury nor any other creditor may maintain its own fraudulent[3]-transfer action, especially for its own account. The trustee or debtor in possession "occupies the field," pre-empting competing plaintiffs, and is the only party that may bring such an action, one brought on behalf of the estate. *Delgado Oil Co. v. Torres*, 785 F.2d 857 (10th Cir. 1986) (where corporation had commenced a case, creditor could not maintain competing action against director for losses suffered by corporation); *Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198 (9th Cir. 2005) (state-law preference action by assignee pre-empted by Code remedy, *even though* no competing bankruptcy case had been filed). Post-confirmation, as authorized under Section 1123, remains the only party eligible to pursue the litigation. As elsewhere, it is not *the plan* that alters Pillsbury's rights: it's the Code.

Indeed, Cuker's (non-plan) monopoly on the ability to pursue such litigation is one reason that Cuker obtained the tolling of the statutes of limitation on possible avoiding actions. In Cuker's view, Cuker is solvent, and no recovery from transferees is needed to pay creditors. But just in case, if the situation becomes much less favorable than the evidence suggests, Cuker may pursue the actions. Pillsbury may retain the ability to petition the Court to compel Cuker to pursue the litigation or to allow Pillsbury to prosecute such litigation on behalf of all unpaid creditors, if appropriate. Based on the cash in the bank that more than covers Pillsbury's

---

[3] "Voidable," under the new terminology. Cal. Civ. Code § 3439.

disputed claim, Cuker believes that such litigation now is unnecessary. But the key considerations are that the ability to pursue the litigation is preserved (outside the plan), and the plan does nothing to limit whatever rights Pillsbury may have.

**D. <u>The Plan Does Not Discharge Debts And Should Not Unduly Immunize Statements</u>**

The plan does not discharge debts under Section 1141 of the Code. To the extent that the disclosure statement still contains a reference to such a discharge, the plan itself provides that in the event of a conflict between the plan and the disclosure statement, the plan controls.

And confirmation of the plan, by itself, should not prevent a statement in the plan (or disclosure statement) from being admitted into evidence elsewhere. If the statement is otherwise admissible before confirmation, it should remain. The text that Pillsbury focuses on is boilerplate that perhaps does not belong in this plan. But by the same token, if the statement is otherwise inadmissible (as part of a compromise effort, for example), confirmation should not change that. The confirmation order may provide simply that neither the plan nor the confirmation order affects the admissibility in any other proceeding.

**E. <u>The Prevention Of An Estoppel Is Not Impairment</u>**

By the same token, however, confirmation of the plan does not and should not work any estoppel or have any preclusive effect. The gist of the plan is that it is not altering the legal, equitable, or contractual rights of the creditors. Preconfirmation, without confirmation, the creditors' rights to assert an estoppel or similar preclusive effect would be limited. The plan merely confirms that neither the plan itself nor confirmation enlarges those rights (even if those rights might *customarily* result).

The judge-made law that has developed about this estoppel, that the failure to adequately disclose litigation plans results in the loss of litigation rights, is largely about misleading creditors, lulling them into a false sense of security, encouraging them to vote to accept the plan, and then sandbagging them with litigation,

sometimes with the result that the debtor realizes value at the expense of the creditors. Here, where Cuker has solicited no creditor acceptances, where it has stated that it will file all its objections to claims before confirmation, and where it is aggressively pursuing the most significant claims, the ones against Pillsbury in the arbitration, there can be no false sense of security. Creditors have been duly told that they are not entitled to a windfall estoppel argument: nothing in the Code requires that they be given one.

## IV. WOLFE'S CONFIRMATION OBJECTIONS SHOULD BE OVERRULED

Cuker's Plan addresses Wolfe's twice amended claim and sets aside funds to pay the claim if allowed, including Wolfe's claim to entitlement of 21.6% annual interest. In all three claims, Wolfe states that the annual interest rate when the case was filed is 21.6%. The most recent is Claim No. 5-3 filed on September 3, 2020, which cites Wolfe's claim to a Fixed Annual interest rate of 21.6%. In none of the three claims filed has Wolfe claimed that on top of the 21.6% annual interest rate described in the three claims, she's entitled to additional interest of 10%. In the most recent claim (No. 5-3; filed September 3, 2020) Wolfe claims for the first time to be entitled to administrative priority, and yet has never filed an application to be employed by the estate (a difficult task since the claim is for post-petition services rendered to Mr. Atalla up until February 2019). The plan does not affect these assertions. Under the Plan, if Cuker owes Wolfe money, Wolfe gets paid.

The legal issues surrounding the appropriate post-petition interest rate to be employed present legitimate questions for the Court's determination (and, Cuker submits, only one answer). Once the unimpairment interest rate is decided, confirmation of the Debtor's Fourth Amended Plan should follow.

## V. CONCLUSION

Cuker's exit from Bankruptcy most properly should come through confirmation of its 4th Amended Plan based on its ability to have generated net

income to pay and provide for 100% of creditors' claims with interest. Neither of the two objecting creditors, each holding a disputed claim, has raised viable objections. For the reasons set forth above Cuker's plan should be confirmed.

DATED: November 11, 2020

SOLOMON WARD SEIDENWURM & SMITH, LLP

By: /s/ Michael D. Breslauer
MICHAEL D. BRESLAUER
*Co-Counsel for Debtor CUKER INTERACTIVE, LLC*

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**

**AAA Case No. 01-18-001-5005**

**Pillsbury, Winthrop, Shaw & Pittman, LLP,**
**Claimant and Counter-Respondent**

**-vs-**

**Cuker Interactive, LLC,**
**Respondent and Counter-Claimant**

# CASE MANAGEMENT ORDER NO. 4

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA), a Case Management Conference was held on September 24, 2020. Present via videoconference were Arbitrator Thomas P. Hanrahan, Paul E. Burns, and Dan H. Deuprey. Appearing for Claimant ("Pillsbury") were Heather Rosing and Leah Lorenz; appearing for Respondent ("Cuker") was Robert Prata.

By agreement of the parties and Order of the Arbitrator(s), the following is now in effect:

## 1. PRELIMINARY ISSUES

**A. Disclosures.** The Arbitrators have confirmed that they have no additional disclosures to make at this time, and the parties have confirmed that they have no objection to any of the members of the Panel based on disclosures made thus far, and have no further information at this time to convey that members of the Panel should consider with respect to disclosures.

**B. Status of Bankruptcy Case**

(i) This case was stayed pursuant to the filing of a case in the United states Bankruptcy Court entitled *In re Cuker Interactive, LLC*, NO. 18-07363-LA11, United States Bankruptcy Court for the Southern District of California. On or about March 24, 2020, the Court lifted the stay to permit the parties to litigate their claims against each other in this arbitration case.

(ii) A hearing before the Bankruptcy Court on confirmation of a proposed plan or reorganization is scheduled to begin November 18, 2020. Both parties expressed the view that the bankruptcy case is not any impediment to proceeding in this matter.

(iii) The parties are directed to submit to the Panel and to the Case Manager a joint report after conclusion of the hearing on confirmation of the plan.

**C. The Walmart Litigation.** The Parties agree that the litigation Cuker brought against Walmart in Arkansas is now substantively concluded (subject to any further proceedings

related to enforcement of injunctive relief) and Walmart has paid the judgment into the bankruptcy estate. The parties discussed briefly their differing views of the impact of the Walmart litigation on this case.

**D. Effect of Prior Orders.** Except as amended by this Order, the provisions of prior Orders remain in effect. This concerns particularly Sections V, VI, and VII of the Scheduling Order dated November 28, 2018 regarding Discovery and Motions.

## 2. PLEADINGS AND RELATED MATTERS

**A. Amendments.** The parties do not anticipate any amendment to the Claim or Counterclaim, subject the following: Cuker has not yet paid the filing fee on its Counterclaims due under the AAA fee schedule based on the amount claimed as set forth tin "Respondent's Damages Statement" filed November 12, 2018. Cuker may consider adjustments to the amount it seeks and shall pay the appropriate AAA filing fee on or before the date set forth below. Any other amendments to the claim or Counterclaim shall be filed on or before the date set forth below.

## 3. EXCHANGE OF INFORMATION/DISCOVERY

**A. Trade Secret Disclosure.** On or before the date set forth below, Cuker shall provide to Pillsbury information consistent with California Civil Code § 2019.210 regarding the trade secrets at issue in Cuker's Counterclaim.

**B. Protective Order.** On or before the date set forth below, the Parties may submit for entry by the Panel an agreed form of protective order. If the Parties are unable to agree, they shall submit to the Panel their positions, and any proposed order.

**C. Subpoenas.**

(i) Only the Panel may issue subpoenas. Any party seeking the issuance of a subpoena to secure the appearance of non-party witnesses or documents shall first disclose the subpoena to the other Party, and attempt to resolve any objections, before submitting it to the Panel. If a Party objects to issuance of the subpoena, that fact must be disclosed to the Panel when the subpoena is submitted for the Panel's consideration. The party objecting to the subpoena shall present its objection to the Panel within two (2) business days after issuance is requested. A telephonic hearing may be ordered to address the objection or any concerns the Panel may have about the subpoena.

(ii) The Panel directs the parties to the limitation on third-party discovery under both the Federal Arbitration Act and the California Arbitration Act. See, *e.g.*, *Aixtron, Inc. v. Veeco Instruments, Inc.*, 52 Cal.App.5th 360 (July 16, 2020) and *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703 (9th Cir. 2017). Parties should take these into account before seeking issuance of subpoenas. Upon stipulation or motion, the Panel will consider procedures to accommodate the need to obtain testimony or documents before the scheduled Evidentiary Hearing date.

**D. Experts.**

(i) On the dates set forth below, the Parties shall exchange reports for witnesses expected to offer expert testimony. Such reports shall include a resume or *curriculum vitae* for the expert, and either a written report prepared and signed by the witness or other written disclosure contain the following information: (1) a complete statement of all opinions to be expressed and the basis and reasons therefore; (2) the data or other information considered by the witness in forming the opinions; (3) any exhibits to be used as a summary of or support for the opinions; (4) the qualifications of the witness, including a list of publications authored by the witness within the preceding five years; (5) the compensation to be paid for the study and testimony; and (6) a listing of any other cases in which the witness has testified as an expert at trial or deposition in the preceding four years.

(ii) Depositions of experts shall be taken only if authorized in advance by the Panel.

**4. PRE-HEARING PROCEDURES AND DISCLOSURES**

**A. Final Evidentiary Hearing:**

(i) The Parties and the Panel have agreed to and the Panel has reserved the following hearing dates:

**February 15-19, 2021; February 22-26, 2021; and March 1-2, 2021**

(ii) Parties and Counsel should regard these dates as firm; they will not be changed or continued absent exceptional circumstances, upon a showing of good cause.

(iii) The location for an in-person hearing, and determination of whether some or all of the hearing may be conducted via videoconference, will be determined at a later date.

**B. Final Status Conference**: A Final Status Conference call will be held on the date shown below. The Parties shall confer regarding a proposed agenda and shall submit a proposed agenda for the call no later than three (3) days before this Conference. The agenda should cover the parties' proposals and suggestions, and consider some or all of the following topics: (a) logistics for the hearing (technology needs; exhibit binders; daily schedule; reporter; special accommodations for any participant); (b) allocation of time between parties; (c) witnesses (whether parties propose to offer direct examinations in writing; anticipated sequence of witnesses; need to hear any witness out of order; testimony through video or telephonic conference call; exclusions of witnesses until after they have testified); (d) exhibits (*e.g.*, objections; whether all exhibits are deemed part of the record); (e) experts (*e.g.*, submission of reports in lieu of direct examination; "hot-tubbing" or similar coordinated presentation); (f) opening statements; (g) anticipated requests for attorney's fees; (h) other matters affecting the conduct of the hearing.

**C. Offers of Compromise:** Any party that has served an offer of compromise which, under applicable law, could affect the amount of damages or allocation of costs and fees shall inform the Case Manager, not the Panel of that fact before the Evidentiary Hearing

begins. The disclosure should state only whether such an offer was made, not who made it or the terms offered.

**D. Arbitration Hold**: The Parties are reminded of their obligations regarding preservation of evidence pertinent to the issues raised by the Demand or the Counterclaim.

**E. Ongoing Disclosure Obligations:** Each counsel and Party has a continuing obligation to protect the integrity of the arbitration proceeding by promptly providing the Arbitrator/Panel the information necessary to allow him to comply with his ongoing duties of disclosure pursuant to the Code of Ethics for Arbitrators in Commercial Disputes and the Ethics Standards for Neutral Arbitrators in Contractual Arbitration adopted pursuant to California Code of Civil Procedure Section 1281.85. Counsel, for themselves and for each of their clients, acknowledge the continuing obligation to supplement the identification of potential fact and expert witnesses, consulting experts, counsel participation and representation in any capacity, and any other individual or entity interested in the outcome of the arbitration. Any issues concerning disqualification of an Arbitrator shall be raised promptly with the AAA Case Manager.

**F. Payment of Fees and Cancellation Policy of the Arbitrators:** The Parties are reminded of the obligation under the AAA Rules to make timely and full payment of arbitration administrative charges and/or deposits requested by the AAA, and the potential consequences if such amounts are not timely received (see AAA Commercial Arbitration Rule R-57). The Parties are further reminded to review and be aware of the Arbitrators' cancellation policies set forth in their Resumes and Notice of Compensation Arrangements.

**G. File Destruction:** The Arbitrators may destroy files related to this matter 90 days after the filing of the Final Award unless otherwise notified by the Parties.

**H. Deadline Enforcement:** All deadlines stated herein will be strictly enforced and adhered to in order to avoid unnecessary delay and to ensure an expedient and fair resolution of this matter. However, upon notice to the Panel, the Parties may by agreement adjust discovery and disclosure dates that affect only the Parties and do not alter hearing or other dates that affect the Panel.

5. **SCHEDULE:**

| **Date** | **Event** |
|---|---|
| | |
| October 8, 2020 | Last day for Respondent-Counterclaimant to submit to AAA any additional filing fee based on amount of damages to be sought in Counterclaim |
| October 16, 2020 | Last day for Respondent-Counterclaimant to disclose trade secret information consistent with California Civil Code § 2019.210 |
| October 20, 2020 | Last day for initial exchange of documents and initial disclosure of witnesses. ***Witness names should be sent to Panel to permit any appropriate disclosures.*** |
| November 1, 2020 | Last day to submit proposed Protective Order |
| November 12, 2020 | Interim status conference at 12:00 p.m. |
| November 13, 2020 | Last day to file any amendments to the Claim or Counterclaim |
| November 20, 2020 | Last day to seek authorization for dispositive motion |
| November 20, 2020 | Mutual disclosure of expert witnesses. ***Witness names should be sent to Panel to permit any appropriate disclosures.*** |
| December 9, 2020 | Mutual disclosure of rebuttal expert witnesses. ***Witness names should be sent to Panel to permit any appropriate disclosures.*** |
| December 18, 2020 | Last day to request for additional documents |
| January 5, 2021 | Last day to disclose any supplement to disclosure of witnesses and documents. ***Witness names should be sent to Panel to permit any appropriate disclosures.*** |
| January 6, 2021 | Parties shall exchange expert witness reports described in Sec. 3.D., above, for any experts expected to be called in support of any Party's affirmative case. |
| January 15, 2021 | Parties shall exchange rebuttal expert reports, if any. |
| January 25, 2021 | Parties to exchange final witness lists and exchange any direct testimony to be presented by declaration, affidavit or deposition transcript |
| January 25, 2020 | Fact discovery cutoff<br>Last day to complete expert discovery, if authorized |

| | |
|---|---|
| February 3, 2021 | Parties to file and serve Pre-Hearing Brief; Joint Exhibit List; and Joint Witness List |
| February 8, 2021 | Final Pre-Hearing Conference at 12:00 p.m. |
| February 15-19, 2021<br>February 22-26, 2021<br>March 1-2, 202 | Evidentiary Hearing, beginning at 9:00 a.m.<br>**Location and format To Be Determined** |

This Order shall continue in effect unless and until amended by subsequent order of the Arbitrator.

Dated: October 4, 2020

*Thomas P. Hanrahan*

Thomas P. Hanrahan
For the Panel
Paul E. Burns
Dan H. Deuprey

## PROOF OF SERVICE

I, Wendy A. Yones, declare as follows:

I am employed in the County of San Diego, State of California; I am over the age of eighteen years and am not a party to this action; my business address is Solomon Ward Seidenwurm & Smith, LLP, 401 B Street, Suite 1200, San Diego, CA 92101, in said County and State. On November 11, 2020, I served the following document(s):

**DEBTOR'S REPLY IN SUPPORT OF MOTION TO CONFIRM FOURTH AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 15, 2020**

on each of the interested parties as follows:

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On November 11, 2020, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **Robert R. Barnes robertbarn@outlook.com, phall@allenmatkins.com; bcrfilings@allenmatkins.com**
- **Michael D. Breslauer mbreslauer@swsslaw.com, wyones@swsslaw.com**
- **K. Todd Curry tcurry@currylegal.com**
- **Jonathan S. Dabbieri dabbieri@sullivanhill.com, hill@sullivanhill.com; bkstaff@sullivanhill.com;vidovich@ecf.inforuptcy.com;dabbieri@ecf.inforuptcy.com**
- **Peter L. Duncan peterd@psdslaw.com, bonniec@psdslaw.com**
- **Michael T. O'Halloran mto@debtsd.com, vh@debtsd.com**
- **David Ortiz david.a.ortiz@usdoj.gov, USTP.REGION15@USDOJ.GOV; tiffany.l.carroll@usdoj.gov; abram.s.feuerstein@usdoj.gov**
- **Heather L. Rosing HRosing@Klinedinstlaw.com, mruiz@klinedinstlaw.com**
- **Gerald N. Sims jerrys@psdslaw.com, bonniec@psdslaw.com**
- **United States Trustee ustp.region15@usdoj.gov**
- **Matthew S. Walker matthew.walker@pillsburylaw.com, renee.evans@pillsburylaw.com**

**SERVED BY U.S. MAIL:** On November 11, 2020, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 11, 2020 By: /s/ Wendy A. Yones
WENDY A. YONES